## KRAUSE v. LEWIS.

NEGLIGENCE — OBSTRUCTION OF ALLEY — PERSONAL INJURIES — TRESPASSERS.

> An alley is not a highway in the proper sense of the term, and is not intended for general travel like a street, but is for the convenience of the adjacent property, and where an adjoining owner builds a platform along the side of his building in an alley for the storage and handling of bulky articles of merchandise, and its character and use are not such as to constitute an invitation to the general public to use it as a sidewalk, a person so using it and falling into an unguarded area therein cannot recover from the owner of the building for the injuries sustained.

Error to Gratiot; Stone, J. Submitted April 19, 1906. (Docket No. 54.) Decided July 3, 1906.

Case by Bernard E. Krause against Henry E. Lewis and Charles P. Yost for personal injuries. There was judgment for defendants on a verdict directed by the court, and plaintiff brings error. Affirmed.

*John W. Myers* and *William A. Bahlke*, for appellant.

*Searl & Monfort* and *Lyon & Moinet*, for appellees.

MONTGOMERY, J. Plaintiff brought this action to recover for injuries received by falling into an open area opening upon a platform in an alleyway adjoining defendants' premises in the village of Ithaca. The circuit judge directed a verdict for defendant, and plaintiff brings error.

The appended map will be an aid to an understanding of the situation. An alleyway extends from the westerly side of defendants' store building 32 feet west. This alleyway has been used by the general public at will for

many years. About 1892 or 1893 defendants built a plat-
form on the alley. This platform originally extended
from the head of or entrance to the basement staircase in
the alley to a point just south of the side entrance from
the alley to their building, and was later extended north
to a point about one foot south of the north end of their
building. This platform was built for the storage of salt,
which they bought by the car load, and has always been
used by them to store salt and pile wood on, as well as for
unpacking goods and "generally for the convenience of
the use of our building." Later the defendants con-
structed a double plank margin or addition along the
west edge of this platform, partly for the purpose of keep-
ing water from running under the platform and into the
cellar, and partly to make a substantial edge to back
wagons against in loading and unloading goods, salt, etc.
The north end of the platform was frequently covered
with boxes from which goods had been unpacked, so as
to render the platform impassable for walking purposes
for weeks at a time, and the remainder of the platform
was also so covered that it was impossible to use it to walk
upon for weeks at a time. Later, defendants built a nar-
row walk, leading from the south end of the platform at
the head of the basement stairs, along the alley side of
the cellar stairs, to the front to a point opposite the ap-
proach to the stairway leading upstairs, but stopping a
foot short of the south end of their store building. This
walk was built simply and solely for the accommodation of
defendants and their clerks in going from the store to and
down the outside cellar stairs, and for their upstairs ten-
ants in going back along the side of the stairs to get their
wood which was thrown there. These tenants had their
wood thrown from farmers' wagons under the stairs to
the south of the basement stairs, and for weeks at a time
this wood so covered the narrow walk as to make it im-
passable, and requiring defendants to go out in the road
part of the alley to get by.

There is a basement under defendants' building, used

by them in connection with their business, and there are three basement windows on the west side of the building for the purpose of admitting light and air into the basement, and for such other purposes as they may be used for. The first of these basement windows toward the south is 42 feet north of the south end of the building, and its south edge is 8 feet 1 inch north of the staircase leading to the basement. Each of these basement windows has an area surrounding it, projecting out from the building about 2 feet 10 inches and is about 4 feet 9 inches long. The south area, into which it is claimed that the plaintiff fell on the night in question, was at that time about five feet deep, was capped with a 2-inch plank, 10 inches wide, resting on the stone wall of which the area wall was constructed, and this plank was about 2 inches above the level of the platform adjacent. The south edge of defendants' building is 5 feet north of the north street line of Center street, on which it faces. That 5-foot space is covered by a cement walk which connects with the walk proper, and is used for the purpose of exhibiting goods sold by defendants in their business. Immediately west of the south end of their building defendants constructed a cement platform, extending from the south edge of their building north 3 feet 3 inches to the foot of the stairs leading to the second story. This was built simply and solely for the accommodation and convenience of themselves and their tenants occupying the second floor, and, of course, those who might have occasion to transact business with those tenants. As a result of these several structures, the narrow walk along the side of the stairway laps over or extends by this cement approach to the second-story stairs for a distance of 26 inches. There is a gutter running along the westerly edge of the platform and narrow walk in question, which gutter was constructed by the defendants for the purpose of carrying away from their cellar the water which comes from the north and from the back or side of their building. This water goes across the space between the south end of the

narrow walk and the walk on Center street leading across the alley, and under the walk and into the gutter on Center street; and at the place last mentioned, being south of the narrow walk and west of the approach to the second-story stairs and the adjacent sidewalk, there is a depression of about a foot. Defendants have used this portion of the alley occupied by them for their own business purposes and convenience, and have never personally invited the public to use it as a sidewalk or a thoroughfare. They have seen people using it for that purpose when it was not so full of their property but that they could get along on the westerly edge of the platform. They have never given permission to any one to use it either as an alley or thoroughfare, and they did not give this plaintiff, or any of those who were with him on the night of the accident, permission to cross or enter upon the platform in question or upon their lot back of their store.

On the night in question, there was at least one tier of salt barrels upon the platform in question, lying endways to the building. On the evening in question plaintiff visited three saloons, and finally went to Knickerbocker's saloon, conducted in the third building east of the premises of defendants. Plaintiff was in that saloon when it was announced that it was time to close, and had ample opportunity to go out the front door if he had so desired. The only reason which he gives for not going out the front door at that time is that "I was willing to stay awhile longer with my friends." Plaintiff further testified that when he got ready to go home he did not ask the proprietor to go out the front door; that the reason he didn't was because Bodet, one of his companions, said he knew the way around the back way, and plaintiff thought he did; that plaintiff did not know anything about the back way himself at all, but went out the back way because Bodet said he knew the way. Thereupon plaintiff and three of his companions left the saloon through the back door, and went north across the rear of the premises of these defendants, and towards the alley in question. The

three companions were 15 or 20 feet ahead of plaintiff when they reached the alley, and they went upon the platform. Plaintiff testified that he could see the buildings and could see the alley between the buildings. It is undisputed that at that time the dirt portion of the alley was at least 20 feet wide, and was smooth and dry at the time, and afforded plenty of room for teams and foot passengers to pass to and fro along the west side of the platform. Plaintiff testified that he was headed out towards the middle of the alley, and that his companions called to him to get upon the platform; he being 15 or 20 feet behind them. He left the alley, entered upon the platform, and directly ran against a salt barrel or box standing thereon. He felt the obstruction with his cane, saw some salt barrels on the platform, and walked along on the outside of the platform next to the row of salt barrels. He further says that he remembers his cane hitting against the salt barrel several times; that he would touch the barrels with his cane, but was not far enough towards the outer edge of the platform so that it brought his crutch close to the edge of the platform.

Plaintiff further testifies:

" *Q.* Was there anything between where you were and the roadbed to prevent your going out there to walk in the roadbed ?

" *A.* I did not see anything.

" *Q.* You could have stepped off from the platform and walked on in the middle of the roadbed, and gone out straight that way, could you not ?

" *A.* I could if I so chose.

" *Q.* You didn't choose to do it ?

" *A.* No, sir. They told me to go on the sidewalk.

"*Q.* After that, after you got on the sidewalk, and had run against the salt barrel or box with your cane, at that time you could have gone out in the middle of the roadbed, if you wanted to ?

" *A.* Yes, sir."

Plaintiff further testified that he could see the ground next to the platform; that it was a foot or so below

the platform, that he could tell where the platform stopped, and could see that he had a chance to get off the platform onto the ground. Plaintiff walked with a crutch and a cane on the night in question, and says that he had drunk enough before so as to become intoxicated, but that neither he nor his companions were intoxicated upon this occasion; and it also appeared that, while walking, the distance between plaintiff's cane and crutch was 2 feet 2 inches.

In determining the rights of the parties it is necessary to inquire somewhat as to the rights of the defendants to erect the platform in question, to be used in connection with their building. It has been frequently stated in this State that an alley is not a highway in the proper sense of the term. *Paul* v. *City of Detroit*, 32 Mich. 108; *Bagley* v. *People*, 43 Mich. 355; *Horton* v. *Williams*, 99 Mich. 423. Such alleyway is intended for the convenience of adjacent property, and not for general travel or passage like streets. *Paul* v. *City of Detroit*, supra. Accordingly it was held in *Bagley* v. *People*, supra, that an obstruction to the right of passage through or to the proper use of an alley by those entitled thereto cannot be considered a public wrong. If this be the true rule, and it be held that the public generally cannot have an interest in preventing an obstruction, it would seem to follow that the plaintiff, as a member of the public, cannot assert any greater rights in the alley as a thoroughfare. In the case last cited it was intimated that the construction of a platform to be used in connection with adjacent property might, in some circumstances, be a proper use of an alley. However this may be, the fact appears that this space was devoted to that use, and so far as appears without objection from those beneficially interested in this alley or from the public at large. This did not, under the facts in this case, enlarge the uses of this alleyway, but, on the contrary, restricted such uses by devoting this platform to use as a freight platform and for storage of bulky articles of merchandise.

It is manifest that the platform in question was not so constructed as to constitute an invitation to the general public. The narrow plank walk on the west side was not extended to the street but was a part of the provision made for the occupants of the building. The rear of the platform terminated abruptly, and was elevated from the ground so that it was only at considerable inconvenience that a pedestrian could clamber on to it at that end. The entire platform was frequently obstructed by boxes, barrels, and packages used in connection with defendant's business. Indeed, its construction was such as to indicate that it was designed as a convenient place to unload freight. The most casual glance in the daytime would have disclosed this purpose and would, by reason of that fact, have negatived an invitation. Plaintiff cannot be heard to say that, because he was ignorant of these conditions, an invitation was extended to him. If he chose to invade this place in the night-time, without any appearance of an invitation other than the fact that a platform was there which he could, with some effort, ascend to, he cannot assert that he had a right to expect other conditions than in fact existed, for, even in the dark, it was obvious to him that this was not an ordinary sidewalk. *Redigan* v. *Railroad*, 155 Mass. 44 (14 L. R. A. 276); *Ryan* v. *Towar*, 128 Mich. 463 (55 L. R. A. 310). The instruction was warranted.

The judgment is affirmed.

CARPENTER, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.